UNITED STATES of America,
Plaintiff-Appellee,

v.

Leonard W. ALLEN, aka Leonard
Andrews, Defendant-Appellant.

No. 81–1656X.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 7, 1982.

Decided Oct. 25, 1982.

Rehearing Denied Oct. 25, 1982.

Donald M. Re, Weitzman, Fidler & Re, Los Angeles, Cal., for defendant-appellant.

William J. Landers, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before GOODWIN, WALLACE, and PREGERSON, Circuit Judges.

WALLACE, Circuit Judge:

Allen appeals his conviction for possession of a firearm by one who has previously been convicted of a felony in violation of 18 U.S.C.App. § 1202(a). He contends that reversal is required because two state statutes exempt him from application of section 1202(a). He also argues that the district judge erred in denying his motions to suppress evidence and to dismiss the indictment for vindictive prosecution. We affirm.

I

Allen, using the name Leonard Andrews, ordered firearm parts from a Detroit dealer who was under investigation by the Bureau of Alcohol, Tobacco and Firearms (ATF). The dealer provided ATF with a list of six names and addresses of persons in California who apparently had ordered firearm parts. ATF special agents Paur and Pinkstaff contacted Allen, one of those named, at his place of business in Canoga Park, California. Allen identified himself as Leonard Andrews and displayed a California driver's license in that name. Without giving Allen any *Miranda* warnings, *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), agent Paur asked him about the parts and Allen admitted that he ordered parts for an Ingram MAC–11.38 caliber firearm. He told Paur that the weapon had accidentally started firing automatically and he wanted the parts to restore it to semi-automatic capacity. When

agent Pinkstaff asked Allen to see the firearm, he stated that it was at his home. According to Paur's testimony, when he and Pinkstaff spoke to Allen their sole purpose was to obtain information to provide to the ATF Detroit·office. They did not intend to arrest or detain Allen, nor did they believe they had any basis to do so since they believed Allen's explanation that the firearm accidentally began to fire automatically.

Sometime later ATF agent Royer showed Paur a photograph on a California driver's license in the name of Leonard Allen. Paur recognized the picture on the license to be that of the individual who had identified himself as Leonard Andrews. Royer informed Paur that Allen had a prior criminal record. Until then, Paur was unaware of Allen's previous criminal conviction.

Subsequently, special agent Royer and others executed a federal search warrant at Allen's residence. While Royer advised those present that they were not under arrest and were free to leave, the government has conceded that Allen was in custody for purposes of *Miranda*. However, no *Miranda* warnings were given. Allen was asked which weapons were his, and he accompanied agents through the house and pointed out the weapons in the den that belonged to him. The parties dispute whether Allen asked the agents to be careful of three commemorative rifles in his den before or after the questioning began.

Allen filed several pretrial motions. In his motion to suppress, he argued that the statements made to the ATF agents when they first contacted him were involuntary and in violation of *Miranda*. He argued, therefore, that the statements should be suppressed and, as a result, there was no probable cause for the search warrant. The district court denied the motion, concluding that *Miranda* warnings were not required because there had been no arrest. On the same basis, Allen also sought to suppress the statements he made during the execution of the warrant. The government resisted suppression only of Allen's statement requesting the agents to be careful of his commemorative rifles. As to that issue, the district court denied the motion, finding that the statement was made before any questions were asked.

After the district court denied Allen's motion to strike references to his prior conviction and his motion to dismiss for vindictive prosecution, the trial proceeded before the district judge. It was stipulated that Allen was the same individual who was convicted of larceny and store breaking in North Carolina, that Royer would testify that pursuant to the search warrant, a Winchester, Model 94, 130–30 caliber rifle was taken from a gun cabinet in Allen's residence, that this rifle was a National Rifle Association Commemorative issue, that the rifle was test-fired and found to be operative, that it had been manufactured outside of California, and that Allen made the statement which the district court had ruled admissible.

## II

Allen argues that his 1964 North Carolina felony conviction cannot be used as a predicate offense for a violation of 18 U.S.C.App. § 1202(a), which provides in part:

> Any person who—
>
> (1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony,
>
> .   .   .   .   .
>
> and who receives, possesses, or transports in commerce or affecting commerce ... any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

Under *id.* § 1203(2), persons who have been "pardoned" and have been "expressly authorized ... to receive, possess or transport ... a firearm" by the chief executive of a state are exempt from liability under section 1202(a).

Although Allen has not received a pardon from the governor of North Carolina, nor an express authorization to carry firearms, he argues that under the statutory scheme of North Carolina he has been given the

functional equivalent of such a pardon and authorization. He relies on two state statutes. Section 13–1 of the North Carolina General Statutes provides that anyone convicted of a crime and whose rights of citizenship are forfeited, shall have their rights restored upon unconditional discharge after service of the sentence imposed. Section 14–415.1 provides that it shall be unlawful for a person convicted of certain crimes to possess a firearm only for a period of five years after the discharge from his sentence. N.C.Gen.Stat. § 14–415.1. The five years have passed for Allen. Read in conjunction, Allen argues that he has been given what is tantamount to the pardon and express authorization to carry firearms required by section 1203(2). We disagree.

In *United States v. Potts,* 528 F.2d 883, 885 (9th Cir. 1975) (en banc), we held that a felony conviction expunged by a state statute could be used as a predicate offense when the state statute specifically provided that the prior conviction could be pleaded and proved in a subsequent prosecution for another offense. Allen argues that this case does not fall within our *Potts* decision. The defendant in *Potts* claimed that since his conviction was completely erased from his record, he was no longer a person who had been convicted of a felony for purposes of section 1202(a)(1). *Id.* at 884; *see also United States v. Herrell,* 588 F.2d 711, 713 (9th Cir.), *cert. denied,* 440 U.S. 964, 99 S.Ct. 1511, 59 L.Ed.2d 778 (1978). Allen, on the other hand, does not argue that the effect of North Carolina General Statute 13–1 (restoration of citizenship) is to eliminate a prior state conviction as the basis for a federal conviction for possession of a firearm by a convicted felon. He argues that section 13–1 and section 14–415.1 operate as a pardon for purposes of 18 U.S.C.App. § 1203(2). We agree that *Potts* does not directly answer the question whether these North Carolina statutes satisfy the requirements of section 1203(2).

The issue before us is the extent to which state statutory law is relevant to the scope of the exemption provided by section 1203(2). *See United States v. Potts, supra,* 528 F.2d at 887 (Sneed, J., concurring). Issues of statutory construction "must begin with the language of the statute itself.... Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Bread Political Action Comm. v. FEC,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1237–38, 71 L.Ed.2d 432 (1982) (citations omitted). We find it significant that section 1203(2) makes no express or implied reference to such state statutes. Rather, this section specifically exempts persons who have been "pardoned" by the chief executive of a state, in this case the governor of North Carolina, and who have been "expressly authorized" by such chief executive to receive, possess, or transport in commerce a firearm. We conclude that Allen is not such a person. Allen has presented us with no controlling authority or legislative history demonstrating that when Congress used the words "pardoned by ... the chief executive of a State," it meant anything other than an actual pardon by the governor or other chief executive. We have not been directed to any legislative history indicating that Congress intended a statutory grant of clemency or restoration of rights by a state legislature to function as the equivalent of a gubernatorial pardon for purposes of section 1203(2). Allen belongs to that class of convicted felons whose civil rights have been restored by general statute, rather than individually by the governor's pardon. If Congress had desired to extend the exemption to persons in this class, it could easily have done so.

■ We need not reach the question whether Allen has complied with section 1203(2)'s second requirement of an express authorization from the pardoning executive to carry firearms. *See United States v. Sutton,* 521 F.2d 1385, 1389 (7th Cir. 1975). Both requirements must be met in order for Allen to avail himself of the section 1203(2) exemption. As he has failed to demonstrate he was pardoned, it is immaterial whether the North Carolina statute constitutes an authorization to carry a weapon for purposes of section 1203(2).

■ Alternatively, Allen argues that since North Carolina law restores his right to possess firearms, he was without adequate notice that his conduct could subject him to criminal liability. However, Allen is mistaken in contending that the government must show that he knew it was unlawful to possess firearms. Section 1202(a) requires no intent or knowledge that possession is unlawful. On its face, it makes possession alone unlawful. In construing a similar statute, the National Firearms Act, 26 U.S.C. § 5841 et seq., the Supreme Court held that the only knowledge required to be proved was knowledge that the instrument possessed was a firearm. *United States v. Freed*, 401 U.S. 601, 607–09, 91 S.Ct. 1112, 1117–18, 28 L.Ed.2d 356 (1971). The *Freed* reasoning has been consistently applied to prosecutions for violations of section 1202(a). *United States v. Laymon*, 621 F.2d 1051, 1054 (10th Cir. 1980); *United States v. Horton*, 503 F.2d 810, 812–13 (7th Cir. 1974); *United States v. Wiley*, 478 F.2d 415, 417–18 (8th Cir. 1973), *cert. denied*, 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974); *United States v. Crow*, 439 F.2d 1193, 1195–96 (9th Cir. 1971), *vacated on other grounds*, 404 U.S. 1009, 92 S.Ct. 687, 30 L.Ed.2d 657 (1972). *See also United States v. Haddad*, 558 F.2d 968, 974 (9th Cir. 1977).

■ Allen's reliance on *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), is misplaced. There the Court accepted an ignorance of the law defense based on the notice requirements of the due process clause because the case involved "conduct that is wholly passive— mere failure to register . . . unlike the commission of acts, or the failure to act under circumstances that should alert the doer to the consequences of his deed." *Id.* at 228, 78 S.Ct. at 242. Section 1202(a) does not involve merely passive conduct: to violate the law one must knowingly possess a firearm. *See United States v. Freed, supra*, 401 U.S. at 608–09, 91 S.Ct. at 1117–18; *United States v. Horton, supra*, 503 F.2d at 813; *United States v. Crow, supra*, 439 F.2d at 1196.[1]

### III

■ Allen moved to suppress statements he made at his first meeting with ATF agents concerning the ownership of a gun and its location, which were relied upon to establish probable cause for the search warrant. The district court determined that Allen was not in custody at that time.[2] Whether a person is in custody for purposes of *Miranda* is answered by reviewing the totality of facts involved at the time of the alleged restraint. As we stated in *United States v. Booth*:

> Pertinent areas of inquiry include the language used by the officer to summon the individual, the extent to which he or she is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention and

---

1. As to Allen's argument that section 1202(a) constitutes an impermissible intrusion into state affairs under *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), we conclude, as we did in *Hyland v. Fukuda*, 580 F.2d 977 (9th Cir. 1978), that the statute here does not take from the state one of the "functions essential to separate and independent existence." *National League of Cities v. Usery, supra*, 426 U.S. at 845, 96 S.Ct. at 2471. "[T]he federal rule challenged here, unlike that in *Usery*, is aimed specifically at individual conduct and its impact on the states is very indirect." *Hyland v. Fukuda, supra*, 580 F.2d at 981 n.5.

In addition, Allen's argument that he was entrapped because he was told by his parole officer that he could possess firearms is utterly without merit. Entrapment occurs when the criminal design "originates" with the government mental agents and they "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells v. United States*, 287 U.S. 435, 442, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932); *see Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (plurality opinion). Allen was indicted for violating the federal gun laws. He has not claimed that any federal officials acted to induce the commission of the offense for which he was indicted. The actions of his North Carolina parole officer are irrelevant to an entrapment defense.

2. The district judge actually stated that he found there was "no implication of arrest." From this we infer that he found that a custodial situation did not exist.

the degree of pressure applied to detain the individual. Based upon a review of all the pertinent facts, the court must determine whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.

669 F.2d 1231, 1235 (9th Cir. 1981). We affirm the district judge's determination of this issue unless he is clearly erroneous. *Id.* at 1236. We conclude that he was not.

Allen was contacted by the ATF agents at his place of business, during business hours. No threats or promises were made to him, nor was he physically restrained in any manner by the agents. There is no evidence of any pressure exerted either to keep him in the agents' presence or to answer questions. The agents testified that the sole purpose of their visit was to obtain information for Detroit ATF agents, that at no time did they intend to arrest Allen, and that they did not believe they had any basis to do so. Allen argues, however, that after telling the agents he owned a weapon that had fired automatically, which might be an indictable offense, 18 U.S.C. § 922(a)(4), they had probable cause to arrest him and thus a form of custodial compulsion existed. The agents testified that they believed Allen's explanation that the firearm had accidentally begun to fire automatically; Allen has not pointed to any facts in the record that would require the district judge to disbelieve the agents' testimony. Moreover, probable cause to arrest is in no way sufficient to establish that a suspect was in custody. Even if the agents had probable cause to arrest Allen, which they deny, that would not indicate that a reasonable innocent person in such circumstances would conclude that after brief questioning he would not be free to leave. Viewing the totality of facts before the district judge, we cannot say that his determination that Allen was not in custody for *Miranda* purposes was clearly erroneous.

■ Allen also sought to suppress the statement he made during the search of his residence that the ATF agents be careful of his three commemorative rifles. The government concedes that Allen was in custody during the search. Allen argues that the district court erred in finding that the statement was volunteered upon Allen's own initiative and was not made in response to interrogation by the agents. Statements volunteered by a suspect in custody are admissible despite the absence of *Miranda* warnings if they are free from interrogation or other coercion. *Miranda, supra,* 384 U.S. at 478, 86 S.Ct. at 1629; *Phillips v. Attorney General of California,* 594 F.2d 1288, 1290 (9th Cir. 1979). The determination of voluntariness by the district court is also reviewed under the clearly erroneous standard. *Klamert v. Cupp,* 437 F.2d 1153, 1155 (9th Cir. 1970).

■ The district court based its finding that Allen's statement was voluntary on the uncontroverted testimony of agent Royer. In his affidavit and on cross-examination, Royer explained that upon arriving at Allen's residence he immediately advised Allen that he was there to execute a search warrant for guns. Royer testified that before the agents asked Allen any questions, he asked the agents to be careful with his three commemorative rifles. Royer further testified that 20 to 30 minutes later, he accompanied Allen into his den and asked him which guns belonged to him. Royer did not remember whether Allen reiterated his warning to protect the commemoratives at that time. The district judge believed Royer. Determinations of credibility by the trier of fact are to be given great weight. *Cf. Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1078–79 (9th Cir. 1977) (The trier of fact " 'sees the witnesses and hears them testify, while the ... reviewing court look[s] only at cold records.' "), *quoting NLRB v. Walton Manufacturing Co.,* 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962). Our review of Royer's affidavit and cross-examination reveals that it is not internally inconsistent. As the district judge pointed out, it is not implausible that a person, aware that agents were about to seize his guns, would immediately ask them to be careful with firearms which were of great value. The district court's finding

**460**

that Allen's statement was volunteered was not clearly erroneous.

## IV

Allen contends that the district judge erred in refusing to dismiss the indictment on the ground of vindictive prosecution. The indictment in this case was not returned until more than one year after the execution of the search warrant. The government concedes that the reason for this delay was that it was awaiting a disposition of an unrelated criminal prosecution against Allen in the District of Oregon before deciding whether to go forward in the instant case. As the government states in its brief, "[t]his decision was made because it was believed that if the defendant received a substantial sentence on the Oregon case, there would be no compelling interest to proceed on the present case." Allen argues that this is an improper, vindictive justification which penalizes him for seeking and obtaining favorable treatment at the time of his Oregon sentencing.

█ The right to due process of law is violated where the government undertakes a course of action with the objective to penalize a person for exercising a protected statutory or constitutional right. *United States v. Goodwin*, —— U.S. ——, —— & n.2, 102 S.Ct. 2485, 2488 & n.2, 73 L.Ed.2d 74 (1982) (*Goodwin*). "After all, penalizing a person for doing what the law plainly allows him to do 'is a due process violation of the most basic sort.'" *United States v. Burt*, 619 F.2d 831, 836 (9th Cir. 1980), *quoting Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978). Thus, in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (*Pearce*), the Supreme Court held that due process prohibits a trial judge from imposing a harsher sentence on retrial in retaliation for the defendant's successful exercise of the statutory right to challenge his original conviction. "[S]ince the fear of such vindictiveness may unconstitutionally deter defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a de-

fendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." *Id.* at 725, 89 S.Ct. at 2080 (footnote omitted). In order to assure the absence of such retaliatory motivation, the Court concluded that whenever a trial judge imposes a more severe sentence upon retrial, the reasons for the increase must relate to actions of the defendant occurring after the original sentencing and must affirmatively appear in the record. *Id.* at 726, 89 S.Ct. at 2081. The Court in *Pearce* applied a "presumption of vindictiveness," which may be overcome only by objective information in the record justifying the increased sentence. *See Goodwin, supra*, —— U.S. at ——, 102 S.Ct. at 2489. In *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974) (*Blackledge*), the Supreme Court extended the rule of *Pearce* to situations involving the apprehension of vindictiveness by prosecutors.

█ While the government freely admits the reason for its delay in the indictment, there is nothing in that concession nor is there "evidence in this case that could give rise to a claim of *actual* vindictiveness; the prosecutor never suggested that the [delay] was ... to influence [Allen's] conduct. The conviction in this case may be reversed only if a *presumption* of vindictiveness—applicable in all cases—is warranted." *Goodwin, supra*, —— U.S. at ——, 102 S.Ct. at 2493 (emphasis in original; footnote omitted). Nevertheless, there are limits to this general rule. As the Supreme Court recently cautioned in *Goodwin*, "[g]iven the severity of such a presumption, however,—which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct—the Court has [presumed vindictiveness] only in cases in which a reasonable likelihood of vindictiveness exists." *Id.* at ——, 102 S.Ct. at 2489. In this case, therefore, we are faced with the question whether a presumption of vindictiveness—applicable in all cases—is warranted when the government bases its decision to prosecute on the severity of the sentence received by a defendant in an earlier unrelated prosecution.

Although Allen has not specifically identified what statutory or constitutional rights he was penalized for seeking to exercise, we assume that the right to "obtain favorable treatment at sentencing," as Allen delineates it, involves some identifiable due process concerns. We need not decide this issue, as the government argues, on the ground that the decision to prosecute was not made in response to anything Allen did but in consideration of the sentence he received. Even assuming that the government's action could properly be characterized as a response to the exercise of some procedural rights by Allen, we cannot agree that such action poses a realistic likelihood of vindictiveness that would necessitate the broad prophylactic rule of *Pearce* and its progeny.

In *United States v. DeMarco*, 550 F.2d 1224 (9th Cir.), *cert. denied*, 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977), we addressed whether there was an opportunity for vindictiveness in the situation where the government sought an additional indictment after the defendant exercised his statutory right to change venue in an earlier prosecution. In affirming the dismissal of an indictment due to the apprehension of vindictiveness, we observed that the prosecutor " 'ha[d] considerable stake in discouraging' defendants from exercising their venue rights when the effect 'will clearly require increased expenditures of prosecutorial resources' because the prosecutor loses the advantage of trying alleged conspirators together and must also conduct two trials in different parts of the country." *Id.* at 1227, *quoting Blackledge, supra,* 417 U.S. at 27, 94 S.Ct. at 2102. In the present case, however, we cannot perceive any increased burden on the prosecutor arising from Allen's exercise of procedural rights at the time of the Oregon sentencing. Every defendant who has been convicted of or pled guilty to an offense is expected to seek favorable treatment at the time of sentencing, thus inevitably imposing some burden on the government. As the Supreme Court observed in *Goodwin*, "[i]t is unrealistic to assume that a prosecutor's probable response to [pretrial motions routinely filed

by criminal defendants] is to seek to penalize and to deter." —— U.S. at ——, 102 S.Ct. at 2493. We think it equally unrealistic to presume that prosecutors threatening criminal defendants with an additional indictment would do so in order to deter them from actively pursuing favorable treatment at sentencing. Not only does the burden on the government at sentencing arise in every criminal case, but it does not require "duplicative expenditures of prosecutorial resources" as in *Pearce* and *Blackledge. Id.* at ——, 102 S.Ct. at 2493. Surely it can be argued that some prosecutor might do so, but "a mere opportunity for vindictiveness is insufficient to justify the imposition of a prophylactic rule. As *Blackledge* makes clear, 'the Due Process Clause is not offended by all possibilities of increased punishment ... but only by those that pose a realistic likelihood of "vindictiveness." ' " *Id.* Thus, because no presumption of vindictiveness attached to the prosecution's conduct in this case and there was no direct evidence of vindictiveness, the district judge did not abuse his discretion in refusing to dismiss the indictment. *United States v. Griffin*, 617 F.2d 1342, 1347 (9th Cir. 1980).

AFFIRMED.